United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOSEPH P NORELLI,

             Petitioner,

  v.

SFO GOOD-NITE INN,

             Respondent.
_____/

No. C06-07335 MJJ

**ORDER GRANTING PETITIONER'S MOTION FOR TEMPORARY INJUNCTION**

## INTRODUCTION

Before the Court is Petitioner Joseph P. Norelli's Petition For a Temporary Injunction Under Section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j)[1] ("the Act") and Motion to Try Section 10(j) Injunction on the Basis of the Administrative Record.[2]  Mr. Norelli is the Regional Director of Region 20 and brings this action for, and on behalf of, the National Labor Relations Board ("Petitioner" or "Board").  Petitioner seeks a temporary injunction restraining Respondent SFO Good-Nite Inn, LLC ("Respondent") from engaging in unfair labor practices pending the final disposition of the matters now pending before the Board.  Respondent opposes the petition for a temporary injunction,[3] but does not oppose the motion to try the injunction on the basis of the

---

[1]Docket Nos. 3, 14, and 15.

[2]Docket No. 4.

[3]Docket No. 20.

administrative record.[4]  For the following reasons, the Court **GRANTS** the Petition for a Temporary Injunction and **GRANTS** the Motion to Try the Injunction on the Basis of the Administrative Record.

**PROCEDURAL HISTORY**

On October 14,  November 22, and December 15, 2005, Unite Here! Local 2 ("the Union") filed the original charge, amended charge, and second amended charge, respectively, with the Board.  (Petition ("Pet.") Ex. B, Decision.)  The Union alleged that Respondent had committed certain violations of the Act.  On March 1, 2006, the Board issued a Complaint and notice of hearing charging that Respondent had engaged in unfair labor practices in violation of sections 8(a)(1), (3), and (5) of the Act.  (Pet. Exs. C, D, and E.)[5]  Administrative Law Judge, Jay R. Pollack ("the ALJ"), heard the case on April 18 through April 20, on May 23, and on June 13, 2006.  The ALJ issued his decision on September 28, 2006.  (Pet. Ex. B, ALJ Decision.)

The ALJ concluded that Respondent had violated: (1) section 8(a)(1) of the Act by threatening employees with loss of benefits or promising employees benefits in order to obtain support for an anti-union petition; (2) sections 8(a)(3) and (1) of the Act by discharging two employees in order to discourage union activities and membership; and (3) sections 8(a)(5) and (1) of the Act by withdrawing recognition from and refusing to bargain with the Union.  (*Id*. at ¶. 10-11.)

The ALJ recommended issuance of an Order that Respondent cease and desist from: (1) threatening employees with loss of benefits or promising benefits in order to discourage union membership; (2) discharging employees in order to discourage union membership; (3) withdrawing recognition from the Union as the exclusive bargaining representative; (4) refusing to meet and

---

[4]Docket No. 21.

[5]General Counsel for Petitioner amended the Complaint at the hearing on April 18, 19, and June 13, 2006.  (Pet. Ex. B.)  The Complaint alleges that Respondent unlawfully threatened employees with a reduction in hours, threatened to withhold approval of a vacation request, promised benefits, interrogated employees, solicited employees to sign an anti-union petition, and threatened employees with termination for opposing an anti-union petition.  The Complaint also alleges that Respondent terminated the employment of two housekeeping employees because they refused to sign an anti-union petition.  Finally, the Complaint alleges that Respondent unlawfully withdrew recognition from the Union during the term of the contract and that withdrawal of recognition was unlawful because it relied on a tainted employee petition as the putative evidence of loss of majority support.  (Pet. Ex. B.)

*(Left margin, vertical text)* **United States District Court**  For the Northern District of California

**United States District Court**
For the Northern District of California

1   bargain with the Union; and (5) interfering with, restraining, or coercing employees in the exercise

2   of their rights under Section 7 of the Act.  (*Id.*)  The ALJ also recommended, among other things,

3   that Respondent take affirmative action to: (1) meet and bargain with the Union; (2) offer certain

4   discharged employees full reinstatement with back-pay, and (3) post a notice of the Order.  (*Id.* at p.

5   12.)

6        This case's procedural posture differs from many others in which an injunction is sought.

7   Rather than asking for an injunction as a precursor to an ALJ's adjudication on the merits, Petitioner

8   asks for an injunction as a precursor to a decision on the merits by the National Labor Relations

9   Board ("NLRB").  However, because Respondent has appealed[6] the ALJ's decision to the NLRB,

10  the petition for a temporary injunction is not moot.  *See Aguayo v. S&F Market Street Healthcare*

11  *LLC*, 179 L.R.R.M. 2393 (C.D. Cal. 2006).

12                                **FACTUAL BACKGROUND**

13       The Court derives the factual summary that follows from the administrative record of the

14  evidentiary hearing conducted before the ALJ.

15       Respondent is the owner and operator of a hotel near the San Francisco International Airport.

16  (General Counsel ("GC") Ex. 1.)  At the time Respondent acquired the hotel in March 2004, the

17  Union was the exclusive collective bargaining representative of the hotel's housekeeping and

18  maintenance employees.  (*Id.*; Board Transcript ("Tr.") at 8.)  Prior to Respondent's acquisition of

19  the hotel, Respondent's predecessor and the Union had agreed to a one-year extension of the existing

20  collective bargaining agreement ("the Agreement") through November 2004.  Upon acquisition of

21  the hotel, Respondent agreed to assume responsibility of the Agreement.  (*Id.*)

22       The Union sent a notice of its intent to change the Agreement on August 3, 2004.  (Pet. Ex.

23  B. at p. 3.)  Respondent and the Union subsequently agreed to preserve the status quo of the

24  Agreement during their contract negotiations.  Section 47 set forth the term of the Agreement and

25  provided,

26                This Agreement shall be in effect for the period commencing
                  December 5, 1999 and continuing to and including November 30,
27

28          [6]On October 26, 2006, Respondent filed exceptions to the ALJ's decision.  Petitioner timely filed a brief in support
       of the ALJ's decision.

                                                      3

United States District Court

For the Northern District of California

2003.  At least ninety (90) days prior to November 30, 2003 either party may serve notice upon the other by Certified Mail, of a desire to terminate, change, or modify this Agreement, or any part thereof.  In the event no such notice is given, this Agreement shall be renewed from year to year after the expiration date hereof, subject to written notice of termination or modification ninety (90) days prior to any subsequent anniversary date of the Agreement.  For the purpose hereof, December first (1st) of each year, commending December 5, 1999 shall be deemed the anniversary of this Agreement.  If, prior to the expiration date, following the submission of such notice, unless time is mutually extended, the parties fail to reach an Agreement, then either party shall be free to strike or lock out.

Upon receipt of such notice, it is agreed by both parties that negotiation will commence within fifteen (15) days.  In the event a new wage settlement is not agreed upon by November 30, 2003 this Agreement shall continue beyond the expiration date thereof for such period of time as parties are engaged in negotiating such successor Agreement.

(Respondent ("Resp.") Ex. 10.)  The parties agree that the Agreement was in effect through the time that Respondent withdrew recognition of the Union.  (Tr. 795-803, 886; Pet. Ex. B at p. 9.)

Prior to Respondent's withdrawal of recognition, Respondent and the Union engaged in contract negotiations on March 11, August 23, and September 7, 2005.  (Pet. Ex. B. at p. 3.)  The parties had a future negotiation scheduled for September 27, 2006.  (Tr. 862; Respondent ("Resp") Ex. 17.)  During the negotiations, among other issues, the parties discussed Respondent's financial difficulties, Respondent's failure to make employee trust fund contributions, and the Union's demand that Respondent discharge certain housekeepers[7] unless they joined the Union as required under the Agreement.  (Id.)  The Union provided Respondent with an application for membership in the Union for the housekeepers to sign.  (Id.)

On August 31, 2005, Respondent's general manager, Afzal Chaudry ("Chaudry"), and banquet manager, Naomi Vargas ("Vargas"), met with Respondent's employees to read a memo describing the employees' union dues obligations.  (Id.)[8]  Chaudry told the employees that they had to pay fees and dues to the Union pursuant to the existing Agreement.  (Id.)  The same day, Chaudry called housekeepers Maldonado and Valencia into a separate meeting.  (Id.)  Valencia testified that

---

[7] The employees that had not paid Union dues were Yolanda Gies ("Gies"), Maria Maldonado ("Maldonado"), Christina Valencia ("Valencia"), Daisy Arana ("Arana"), and Mei-Yun Wu ("Wu").  (Id. at p. 3.)

[8] Vargas served as the Spanish interpreter.  (Id. at p. 3.)

Chaudry told them that the employees owed the Union $400 and that if they failed to pay, then the Union would have them fired. (*Id*.) According to Valencia, Chaudry said that the Union was no good, that the Union was costing Respondent a lot of money, that Chaudry did not know why the employees wanted the Union, and that Respondent would give the employees paid vacation and health benefits. (*Id*.)[9] Chaudry told the employees that she did not want to pressure them, but that they could sign a petition to "de-unionize" the hotel. (*Id*.) Chaudry told them to have lunch and then to come back and sign "the paper." (*Id*.) Neither Valencia or Maldonado returned or signed an anti-union petition. (*Id*. at ¶¶ 3-4.) Later the same day, Vargas asked Valencia whether she would sign the paper and why the employees did not want to "de-unionize." (*Id*. at p. 4.)

Additional employees testified regarding Respondent's conduct. Housekeeper Margarita Taloma ("Taloma") testified that Respondent's assistant manager, Leah Aquino ("Aquino"), asked her to sign an anti-union petition in late August 2005. (*Id*.) According to Taloma, Aquino stated that Taloma's situation might not be as good if the hotel remained unionized and that the Union might only let Taloma work part-time. (*Id*.) Aquino said she could only help Taloma if Taloma signed the petition. (*Id*.) Taloma refused. (*Id*.) In September 2005, Aquino went to Taloma's home and again asked Taloma to sign the petition. (*Id*.) Taloma again refused to sign. (*Id*.)[10]

On September 6, 2006, Consuelo Contreras ("Contreras"), an employee responsible for inspecting the quality of the housekeepers' work, spoke with housekeeper Xian Tan ("Tan") about the Union. (*Id*.) Contreras urged Tan not to sign the anti-union petition and spoke in favor of union representation. (*Id*.) Later that day, Chaudry and Respondent's owner, Eric Yokeno ("Yokeno"), asked Contreras why she was telling employees not to sign the petition to de-unionize and warned her she could be fired for doing so on work time. (*Id*.) Chaudry and Yokeno then questioned Contreras about whether she was unfairly scheduling employees by favoring Hispanic housekeepers over Asian housekeepers. (*Id*.) Contreras denied any favoritism. (*Id*.) However, as a result of the

---

[9]At the time of the meeting, Respondent's employees were not receiving Union health benefits because Respondent was in arrears in making trust fund contributions. (*Id*. at p. 3.)

[10]Taloma was also asked to sign the petition by Parwander Kaur, a non-Union front desk employee. (*Id*. at p. 4.)

United States District Court

For the Northern District of California

1   meeting Chaudry assumed Contreras' scheduling duties.  (*Id.*)[11]

2       On September 7, 2006, Chaudry again met with Valencia and Maldonado.  With Contreras

3   interpreting, Chaudry terminated Valencia and Maldonado.  (*Id.*)  Valencia inquired why two other

4   lower-seniority employees, Gies and Wu, were being retained.  (*Id.*)  Chaudry responded by

5   informing Valencia there was no seniority system.  (*Id.*)[12]

6       Also on September 7, 2006, the Union and Respondent attended another negotiation meeting

7   and exchanged bargaining proposals.  (*Id.*)  Although Respondent indicated that further negotiations

8   would not be fruitful due to Respondent's existing financial difficulties, Respondent agreed to

9   engage in a future bargaining session after September 7.  (*Id.* at ¶. 4-5.)  However, no further

10  bargaining session occurred.  (*Id.*)  On September 14, 2005, Respondent withdrew recognition from

11  the Union claiming that a majority of the employees stated they no longer wished to be represented

12  by the Union.  (Pet. Ex. B at p. 3.)[13]

13      On October 4, 2006, employee Luz Verdin ("Verdin") went to Aquino's office to inquire

14  about Verdin's pending vacation request.  (*Id.* at p. 5.)  Aquino told Verdin they would make a deal;

15  Verdin would sign the petition to de-unionize and Aquino would sign Verdin's vacation request.

16  ──────────────

17      [11]Chaudry testified that he called Contreras to determine which housekeepers to terminate.  (*Id.* at p. 5.)  According
18  to Chaudry and Aquino, Chaudry told Contreras that the layoffs were a result of a seasonal business slow down.  (*Id.*)
    Chaudry stated that Contreras suggested to layoff Maldonado and Valencia for performance reasons.  (*Id.*)  However,
19  Contreras denied that Chaudry ever asked her opinion as to which employees should be laid off.  (*Id.*)  Contreras also testified
    that Valencia and Maldonado performed well.  (*Id.*)  Chaudry did not adequately explain to the ALJ why he had laid off
20  employees in the past due to seasonal business slow downs, but decided this time to permanently terminate Maldonado and
    Valencia.  (*Id.* at ¶. 5-6.)  Chaudry also did not adequately explain to the ALJ why he did not recall Maldonado or Valencia
21  (which would have been consistent with past practice) when the hotel experienced an unexpected increase in occupancy from
    September 16 to September 24, 2006.  (*Id.* at p. 6.)

22      [12]The Agreement requires layoffs be based on seniority.  (*Id.*)  However, Respondent argued to the ALJ that the
23  employees at issue were all probationary employees and therefore seniority did not apply.  (*Id.*)  The ALJ found that
    Respondent had a legitimate business reason to layoff housekeepers in September 2005 due to business slow-downs, but the
    ALJ found that Maldonado and Valencia were chosen for layoffs for unlawful reasons.  (*Id.* at p. 5.)

24
25      [13]At the Board hearing, Respondent contended that it did not assist the employees in de-unionizing.  Kaur, a non-
    union front desk employee, testified that she helped housekeeper Sadat Jiminez ("Jiminez") write a petition stating that the
26  employees no longer wished to be represented by the Union.  (*Id.* at p. 6.)  Kaur also testified that part-time housekeeper,
    Ermelina Mariazeta ("Mariazeta") had also expressed a desire to be non-union and that Mariazeta started a petition on
27  September 3, 2005.  (*Id.*)  Mariazeta testified that she left the petition for others to sign.  (*Id.*)  Eleven employees signed the
    petition after Mariazeta.  (*Id.*)  Another petition was signed by employee Juan Reyes ("Reyes").  (*Id.*)  The parties stipulated
28  that a total of 12 employees signed petitions prior to September 14, which would constitute a majority of the bargaining unit
    employees.  (*Id.*)  The ALJ did not find any evidence that Kaur, Jiminez, or Mariaseta were acting on behalf of Respondent
    in assisting with the non-union petitions.  (*Id.*)

1  (*Id.*)  Aquino informed Verdin that most of the employees had already signed.  (*Id.*)  Verdin signed

2  the petition and Aquino approved Verdin's vacation request.  (*Id.*)  Neither the petition or the

3  vacation request contained the date of October 4, 2006, but instead bore a back-date of September

4  14, 2006.  (*Id.*)

5  **LEGAL STANDARD**

6         Section 10(j) of the Act provides that, in response to a request for interim relief from the

7  Board's Regional Director ("the Director"), the district court "shall have jurisdiction to grant to the

8  Board such temporary relief or restraining order as it deems just and proper."  29 U.S.C. § 160(j).

9  Section 10(j) was enacted by Congress to provide interim injunctive relief protecting the integrity of

10  the collective-bargaining process while the NLRB resolves an unfair labor practice charge.  *Miller v.*

11  *California Pacific Medical Center*, 19 F.3d 449, 459-60 (9th Cir. 1994) (en banc).  In adjudicating a

12  section 10(j) request, the district court "should rely on traditional equitable principles to determine

13  whether interim relief is appropriate."  *Scott ex rel. N.L.R.B. v. Stephen Dunn & Assoc.*, 241 F.3d

14  652, 660 (9th Cir. 2001) (citing *Miller*, 19 F.3d 449).

15         To secure relief under section 10(j), the Regional Director must show "either (1) a

16  combination of probable success on the merits and the possibility of irreparable harm, or (2) the

17  existence of serious questions going to the merits, the balance of hardships tipping sharply in its

18  favor, and at least a fair chance of success on the merits."  *Miller*, 19 F.3d at 456 (quoting *Senate of*

19  *Cal. v. Mosbacher*, 968 F.2d 974, 977 (9th Cir. 1992)).  If the Court finds probable success on the

20  merits, then the possibility of irreparable harm is presumed.  *Id*. at 459.  If, however, the Court finds

21  only a fair chance of success on the merits, the Court must engage in a balancing of hardships.  *Id*.

22  This formulation reflects the traditional "sliding scale" of equity jurisprudence where "the required

23  degree of irreparable harm increases as the probability of success decreases."  *United States v.*

24  *Odessa Union Warehouse Co-op*, 833 F.2d 172, 174 (9th Cir. 1987).

25         In *Miller*, this traditional formulation was modified in one respect.  In the context of a section

26  10(j) petition, the court must evaluate the traditional equitable criteria "through the prism of the

27  underlying purpose of section 10(j), which is to protect the integrity of the collective bargaining

28  process and to preserve the Board's remedial power while it processes the charge."  *Miller*, 19 F.3d

United States District Court
For the Northern District of California

1   at 459-60.  Thus, the Board's ability to meaningfully adjudicate disputes arising within its

2   jurisdiction must be balanced against the respondent's showing of hardship.  *Id*. at 460.  Appropriate

3   injunctive relief under section 10(j) can include cease-and-desist orders and interim bargaining

4   orders.  *Stephen Dunn & Assoc.*, 241 F.3d at 660-61.

5                                              **ANALYSIS**

6   **I.      Likelihood of Success on the Merits**

7            At the outset, the Court must evaluate the Petitioner's likelihood of success in the underlying

8   NLRB action to determine the propriety of issuing a temporary injunction pending the NLRB's

9   decision.  To establish a likelihood of success, Petitioner relies on the charge-supporting evidence,

10  the testimony presented to the ALJ, and the subsequent findings and recommendations made by the

11  ALJ.  Respondent argues that disputed legal and factual issues undermine Petitioner's showing of

12  success on the merits and preclude this Court from deferring to the views of the ALJ and Petitioner.

13           In assessing whether the Regional Director has met its likelihood of success burden, it is

14  necessary to factor in the district court's lack of jurisdiction over unfair labor practices, and the

15  deference accorded to NLRB determinations by the courts of appeals.  *See N.L.R.B. v. City Disposal*

16  *Sys., Inc*., 465 U.S. 822, 829 (1984) ("[O]n an issue that implicates [the Board's] expertise in labor

17  relations, a reasonable construction by the Board is entitled to considerable deference[.]"); *Ford*

18  *Motor Co. v. N.L.R.B.*, 441 U.S. 488, 497 (1979) ("Of course, the judgment of the Board is subject to

19  judicial review; but if its construction of the statute is reasonably defensible, it should not be rejected

20  merely because the courts might prefer another view of the statute.").  While the district court is not

21  required to defer to the Board in deciding whether interim relief is "just and proper," it should

22  evaluate the probabilities of the complaining party's success in light of the fact that ultimately, the

23  Board's determination on the merits will be given considerable deference.  *Reichard v. Foster*

24  *Poultry Farms*, 425 F. Supp. 2d 1090, 1094 (C.D. Cal. 2006) (citations omitted).  By the same token,

25  because it is the Board and not the district court which has primary responsibility for declaring

26  federal labor policy, even on an issue of law, the district court should be hospitable to the views of

27  the General Counsel, however novel.  *Miller*, 19 F.3d at 460 (citation omitted)..

28           "[T]he Regional Director can make a threshold showing of likelihood of success by

**United States District Court**
For the Northern District of California

producing 'some evidence' to support the unfair labor practice charge, 'together with an arguable legal theory.'" *Scott*, 241 F.3d at 662 (citing *Miller*, 19 F.3d at 460). Essentially, the Regional Director must demonstrate "'a better than negligible chance of success'" to get into the injunction game. *Reichard*, 425 F. Supp. 2d at 1094 (citing *Scott*, 241 F.3d at 662). "If the respondent concedes the substance of the unfair labor practice charge, or if the Board demonstrates that it is likely to prevail on the merits, we presume irreparable injury. If the charge is disputed, or if the Board has only a fair chance of succeeding on the merits, the court must consider the possibility of irreparable injury." *Miller*, 19 F.3d at 460 (citing *United States v. Nutri-Cology, Inc.*, 982 F.2d 394, 398 (9th Cir. 1992)).

In this case, the Court also considers the unique procedural posture of the action. Here, the ALJ has already rendered a decision and Petitioner seeks an injunction pending a decision on the merits by the NLRB. As a result, in addition to Petitioner's underlying charge and supporting evidence, the Court may also consider the ALJ's underlying factual and legal determinations. In such procedural instances, the district court does not sit in review of the ALJ's decision. *Aguayo*, 179 L.R.R.M. 2393 at 2399 (citing *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 288 (7th Cir. 2001)). Rather, the district court should consider the ALJ's opinion as relevant to the propriety of section 10(j) relief. *Id.* Assessing the likelihood of success calls for a predictive judgment about what the Board is likely to do with the case. *Id.* Since the ALJ is the Board's first-level decision-maker and has presided over the merits hearing, the ALJ's factual and legal determinations supply a useful benchmark against which the Regional Director's prospects of success may be weighed. *Bloedorn*, 276 F.3d at 288. (citing *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 367 (2d Cir. 2001); *Silverman v. J.R.L. Food Corp.*, 196 F.3d 334, 337-38 (2d Cir. 1999) (per curiam); *Rivera-Vega v. ConAgra, Inc.*, 70 F.3d 153, 161 (1st Cir. 1995); *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 37 n. 7 & 40 n. 11 (2d Cir. 1975); *see also Willms v. The Guard Publishing Co.*, 2001 WL 34038572 at *2 (D. Or. 2001) (stating "the decision by the ALJ adds considerable weight to the probability of the Regional Director's success on the merits."). Having outlined the legal principles which govern Petitioner's claim, the he Court now turns to Petitioner's likelihood of success on each of the alleged violations.

**A.      Threats and Promises in Violation of Section 8(a)(1)**

Petitioner has demonstrated that it is likely to prevail on the merits as to the alleged violations of section 8(a)(1).  *Miller*, 19 F.3d at 460.  Section 8(a)(1) of the Act prohibits employers from interfering with, restraining, or coercing employees in the exercise of their rights guaranteed in Section 7 of the Act.  Petitioner has offered evidence of violations by Aquino, Chaudry, and Yokeno.

In support of the contention that Aquino promised benefits to an employee if the employee abandoned union support, Petitioner relies on Taloma's testimony.  Taloma testified that Aquino promised to "help" Taloma if she agreed to sign the petition. (Tr. 72-73.)  *See Fabric Warehouse*, 294 N.L.R.B. 189, 191 (1989) (finding promises of benefits linked to getting rid of a Union "clearly tend to undercut support for the Union [and] . . . that [such] statements violate[] Section 8(a)(1) of the Act.")  Similarly, in support of the charge that Aquino threatened an employee with loss of hours if the employee did not sign an anti-union petition, Petitioner again relies on Taloma's testimony.  Taloma testified that Aquino threatened that Taloma's situation might be worse with the Union because Taloma's hours might be reduced to part-time.  (Tr. 68-69); *see Healthcare and Retirement Corp. of Am.*, 307 N.L.R.B. 52 (1996); *Reeves Brothers, Inc. Bishopville Finishing Div.*, 320 N.L.R.B. 1082 (1999); *El Rancho Market*, 235 N.L.R.B. 61 (1978).  Lastly, there is evidence supporting the charge that Aquino threatened to withhold approval of an employee's vacation request if the employee did not sign an anti-union petition, because Vargas testified that Aquino told Vargas they would make a deal, and that Aquino would sign Vargas' vacation request in exchange for Vargas signing the anti-union petition.  (Tr. 128-29); s*ee Frank Leta Honda*, 321 N.L.R.B. 482 (1996).

Next, Petitioner offered evidence in support of Chaudry and Yokeno's violations of section 8(a)(1).  Specifically, Contreras testified that Chaudry and Yokeno threatened her with termination for speaking in favor of union representation, and for encouraging a fellow employee not to sign the anti-union petition during work time.  (Tr. 248-49.)  However, Chaudry contradicted himself when he testified at the hearing that he was not aware of any rule against discussion of Union matters at work.  (Tr. 48-49.)

**United States District Court**
For the Northern District of California

1    Furthermore the Court notes that the ALJ considered the parties' evidence and found

2  Petitioner's evidence more credible.  In doing so the ALJ substantiated each instance of

3  Respondent's conduct and concluded Respondent had violated section 8(a)(1) of the Act.  (Pet. Ex.

4  B at ¶. 6-7.)  Having considered the proffered evidence and the ALJ's determinations, which are

5  relevant in evaluating Petitioner's ultimate prospect of success, the Court finds that Petitioner has

6  demonstrated that it is likely to prevail on the merits as to the alleged violations of section 8(a)(1).

7         **B.      Discharges in Violation of Section 8(a)(3)**

8         Petitioner asserts that it has also demonstrated that it is likely to prevail on the merits as to

9  the alleged violations of section 8(a)(3).  *Miller*, 19 F.3d at 460.  Respondent counters that it had a

10  legitimate reason to discharge housekeepers Valencia and Maldonado.  Respondent also contends

11  that Petitioner has failed to meet its prima facie burden of establishing that the housekeepers were

12  engaged in "protected activity" of which Respondent was aware.

13         Section 8(a)(3) makes it an unfair labor practice for an employer to, by discrimination in

14  regard to hire or tenure of employment or any term or condition of employment, encourage or

15  discourage membership in any labor organization.  In evaluating alleged wrongful discharges under

16  section 8(a)(3), the Board has set forth a test of causation turning on employer motivation.  *Wright*

17  *Line Inc*., 251 N.L.R.B. 1083, 1089 (1980), *enfd*. 662 F.2d 899 (1st Cir. 1981), *cert denied*, 455 U.S.

18  989 (1982); *N.L.R.B. v. Transportation Management Corp*., 462 U.S. 393, 404 (1983) (approving the

19  analytical framework set forth in *Wright Line*.).  To establish that an employer unlawfully

20  discharged an alleged discriminatee, the General Counsel must show, by a preponderance of the

21  evidence, that the protected activity was a motivating factor in the employer's decision to discharge

22  that employee. Once the General Counsel has made this required showing, the burden shifts to the

23  Respondent to demonstrate, by a preponderance of the evidence, that it would have taken the same

24  action even in the absence of the protected union activity.  *Id*.  In establishing a prima facie case of

25  unlawful motivation, proof of such discriminatory motivation can be based on direct evidence of

26  such union animus or can be inferred from circumstantial evidence based on the record as a whole.

27  *Robert Orr/Sysco Food Services*, 343 N.L.R.B. No. 123 (2004).  To support an inference of unlawful

28  motivation, the Board looks to such factors as inconsistencies between the proffered reasons for the

discipline and other actions of the employer, disparate treatment of certain employees compared to other employees with similar work records or offenses, deviations from past practice, and proximity in time of the discipline to the union activity. *Id.* (citing *Embassy Vacation Resorts*, 340 NLRB No. 94 (2003)).

Here, Petitioner has presented sufficient evidence that Respondent discharged housekeepers Maldonado and Valencia because of their union activities. In establishing a prima facie case, Petitioner points to Valencia's testimony. Valencia testified that on August 31, 2005, Chaudry called Maldonado and Valencia into a separate meeting and told them that they owed the Union money, the Union was no good, the Union was costing Respondent a lot of money, Chaudry did not know why the employees wanted the Union, and Respondent would give the employees paid vacation and health benefits. (Tr. 161-64.) Chaudry told the housekeepers that she did not want to pressure them, but that they could sign a petition to "de-unionize" the hotel. (*Id.*) Chaudry told them to have lunch and then to come back and sign "the paper." (*Id.*) Neither Valencia or Maldonado returned or signed an anti-union petition. (*Id.*) According to Valencia, on September 7, 2006, Chaudry again met with Valencia and Maldonado. (Tr. 163-65.) With Contreras interpreting, Chaudry terminated Valencia and Maldonado. (*Id.*) Valencia inquired why two other lower-senority employees, Gies and Wu, were being retained and Chaudry responded by informing Valencia there was no seniority system.

In response, Respondent argues that no anti-union petition existed as of August 31, 2005, therefore Respondent could not have known of Maldonado or Valencia's protected activity of refusing to sign the anti-union petition. Further, relying on Chaudry's testimony, Respondent contends that it had legitimate reasons to terminate the two housekeepers because Contreras had identified them as poor performers. (Tr. 635.) The ALJ found Respondent's evidence unconvincing for a number of reasons.

First, the ALJ found Chaudry to be "shifting and evasive" regarding the reasons for Valencia and Maldonado's discharge. (Pet. Ex. B at p. 4. ) As a result, he concluded that Chaudry was an unreliable witness. (*Id.*); *Goodyear Tire & Rubber Co.*, 312 N.L.R.B. 674 (1993). Second, the ALJ concluded that Respondent never adequately explained why it decided to terminate rather than layoff

the two housekeepers in accordance with its previous practice. (*Id*. at p. 7.) Third, Contreras contradicted Chaudry and testified that she never identified Valencia or Maldonado as poor performers or recommended them for termination. (Tr. 233-35, 240.) Fourth, the ALJ found that Respondent did not follow its past practice of using seniority in selecting employees for layoffs and did not follow its policy of recalling them when business needs required their service nine days later. (Tr. 8.) Finally, as to the existence of the anti-union petition on August 31, 2005, the ALJ concluded that an anti-union petition did exist by relying on the testimony of Valencia over Chaudry. (Pet. Ex. B at p. 3.) Therefore, while Respondent's business status may have served as a legitimate reason for discharging the housekeepers, Respondent failed to rebut Petitioner's "strong prima facie case that Valencia and Maldonado were selected for termination because of their protected activities of not joining in the effort to 'de-unionize' the hotel." (*Id*. at p. 8.) Accordingly, the ALJ's findings that Respondent's defense was pre-textual "leaves intact the strong prima facie case." (*Id*.) (citing *Limestone Apparel Corp*., 255 N.L.R.B. 722 (1981); *California Gas Transport*, 347 N.L.R.B. No. 118 (2006)).

The ALJ found that Respondent's defense was pretextual. Upon an independent review of the record, the Court finds that Petitioner has submitted evidence to support the finding that Respondent was unlawfully motivated in terminating the two housekeepers. Therefore, based upon its review of the record, the Court finds that Petitioner has established the pretextual nature of Respondent's defense. Respondent's defensive evidence contains contradicted testimony and unexplained inconsistencies. Moreover, the evidence in the record supports a finding that Respondent was unlawfully motivated by union animus in discharging the two housekeepers. As a result, the Court finds that Petitioner has demonstrated that it is likely to prevail on the merits of the section 8(a)(3) allegations.

**C.     Withdrawal of Recognition in Violation of Section 8(a)(5)**

Petitioner argues that the "contract bar" applies therefore Respondent's withdrawal of recognition from the Union during the term of the parties' contract was unlawful as a matter of law. Petitioner also argues that even if Respondent was free to question the Union's status, it was unlawful for Respondent to rely on employee expressions of union disaffection that were tainted by

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   Respondent's unfair labor practices.  Respondent argues, as it did unsuccessfully to the ALJ, that the

2   contract bar does not apply, and that there is insufficient evidence to find that the employees' anti-

3   union petition was tainted.

4       **1.      Contract Bar**

5       The parties do not dispute that the Agreement was in effect through the time that Respondent

6   withdrew recognition of the Union, and that the term of the Agreement was set forth in section 47.

7   (Tr. 795-803, 886; Pet. Ex. B at p. 9.)  Furthermore, the parties had contractually agreed to preserve

8   the status quo during their contract negotiations.  However, the parties disagree as to whether the

9   contract bar precludes Respondent's withdrawal of recognition.  In particular, Petitioner argues that

10  the initial three-year contract was extended by virtue of section 47, requiring the agreement to stay

11  in effect while the parties were negotiating a successor agreement, therefore Respondent was barred

12  from withdrawing until negotiations had ended.  Respondent counters that Petitioner's interpretation

13  of the contract bar rule would require the parties to engage in indefinite contract negotiations thereby

14  precluding any challenge to the incumbent Union.

15      Under the contract bar rule, once an employer and a union enter into a valid collective

16  bargaining agreement, the majority status of the union is irrebuttably presumed for the duration of

17  the contract, not to exceed three years.  *General Cable* Corp., 139 N.L.R.B. 1123 (1962);

18  *Montgomery Ward & Co.*, 137 N.L.R.B. 346, 348-49 (1962); *Westwood Import Co. Inc. v. N.L.R.B.*,

19  681 F.2d 664, 666 (9th Cir. 1982) (citations omitted).  The rule is designed "to promote industrial

20  stability between contractual partners and to afford employees a reasonable opportunity to change or

21  eliminate their bargaining representative."  *East Mfg. Corp.*, 242 NLRB 5, 6 (1979).  In order to

22  protect the bargaining atmosphere, the rule is applied "even if a majority of the employees withdraw

23  their support."  *Pioneer Inn Associates v. N.L.R.B.*, 578 F.2d 835, 838 (9th Cir. 1978) (citation

24  omitted).  The Board has stated, "we cannot interpret our contract-bar rules in such a way as to

25  permit employers or certified unions to take advantage of whatever benefits may accrue from the

26  contract with the knowledge that they have an option to avoid their contractual obligations and

27  commitments through the device of a petition to the Board for an election."  *Montgomery Ward &*

28  *Co.*, 137 N.L.R.B. at 348-49.

United States District Court

For the Northern District of California

1    Here, the ALJ found that Respondent unlawfully withdrew recognition from the Union at a

2    time when it could not lawfully challenge the Union's majority status. (Pet. Ex. B at p. 9.) The ALJ

3    relied on Respondent's admission that the contract "was in place up until the time we withdrew

4    recognition." (*Id.*) In addition to Respondent's admission, the Court notes that section 47 of the

5    Agreement specifically states that the Agreement "shall continue beyond the expiration date thereof

6    for such period of time as parties are engaged in negotiating such successor Agreement." (Resp. Ex.

7    10.) Because the parties were engaging in contract negotiations, and intended to continue those

8    negotiations on September 27, 2006, the term of the contract had not expired at the time Respondent

9    withdrew recognition on September 14, 2006. (Tr. 862; Resp. Ex. 17.) Since the contract had not

10   expired, the contract bar would preclude Respondent's withdrawal of recognition.

11   Respondent argues that its withdraw recognition was appropriate and relies on *Cind-R-Lite*,

12   239 N.L.R.B. 1255 (1979). In *Cind-R-Lite*, the Board stated that in order to serve as a bar to a

13   petition, a contract must have an expiration date apparent from the face of the contract without resort

14   to parol evidence. *Cind-R-Lite*, 239 N.L.R.B. at 1256. In finding the contract bar inapplicable, the

15   NLRB cited to the fact that the contract at issue had no fixed duration and could continue

16   indefinitely. *Id.* at 1256. The current case is factually distinguishable. Here, the Agreement

17   contained an explicit termination date followed by the possibility of subsequent extensions. (Resp.

18   Ex. 10.) The Agreement does not contemplate an indefinite term. Rather, Respondent and the

19   Union bargained and agreed to extend the term of the Agreement to include the time frame of those

20   negotiations, up to, and including September 27, 2006. (*Id.*) Once those negotiations failed, the

21   parties contemplated a termination of the Agreement. (*Id.*) Accordingly, unlike the term of the

22   agreement in *Cind-R-Lite*, the term of the Agreement in the current case contemplated a termination

23   at some point.

24   Because the parties agreed to continue negotiating up to, and including, September 27, 2006,

25   the Agreement had not expired. Since the Agreement had not expired, Respondent was precluded

26   from withdrawing recognition of the Union. Given this evidence, the ALJ's decision, and the

27   principle that district courts should be hospitable to the views of the General Counsel, however

28   novel, the Court finds that Petitioner has demonstrated that it is likely to prevail on the merits of the

1    section 8(a)(5) allegations.  *Miller*, 19 F.3d at 460.

2        Assuming *arguendo* that the contract bar did not preclude Respondent's withdrawal of

3    recognition, the Court now turns to whether Respondent's alleged unfair labor practices tainted the

4    anti-union petition.

5        **2.    Tainted Anti-Union Petition**

6        Petitioner contends that even if Respondent was free to withdraw recognition of the Union on

7    September 14, 2006, the withdrawal was still unlawful because the anti-union petition was a product

8    of Respondent's illegal threats, promises, and terminations.  Respondent argues that it had majority

9    support when it withdrew recognition of the Union, and that it was improper for the ALJ to disregard

10   that majority support.

11       An employer is not privileged to withdraw recognition of the union unless it has actually lost

12   the support of a majority of employees.  *See Levitz Furniture*, 333 NLRB 717, 717-18 (2001).  In

13   *Levitz Furniture*, the Board stated,

> The presumption of continuing majority status essentially serves two
> important functions of Federal labor policy.  First, it promotes
> continuity in bargaining relationships …. The resulting industrial
> stability remains a primary objective of the Wagner Act, and to an
> even greater extent, the Taft-Hartley Act. Second, the presumption of
> continuing majority status protects the express statutory right of
> employees to designate a collective-bargaining representative of their
> own choosing, and to prevent an employer from impairing that right
> without some objective evidence that the representative the employees
> have designated no longer enjoys majority support.

19   *Id*. at 723.  The Board also recognized that it would continue to use its well-established policy that

20   employers may not withdraw recognition in a context of unremedied unfair labor practices tending

21   to cause employee disaffection with the union.  *Williams Enterprises*, 312 N.L.R.B. 937, 939-40

22   (1993), *enfd*, 50 F.3d 1280 (4th Cir. 1995).  In cases involving unfair labor practices other than a

23   general refusal to bargain, the Board has identified several relevant factors in determining whether a

24   causal relationship exists between unremedied unfair labor practices and the subsequent expression

25   of employee disaffection with an incumbent union.  *Id*. at 939.  These evidentiary factors include: (1)

26   the length of time between the unfair labor practices and the withdrawal of recognition; (2) the

27   nature of the illegal acts, including the possibility of their detrimental or lasting effect on employees;

28   (3) any possible tendency to cause employee disaffection from the union; and (4) the effect of the

**United States District Court**
For the Northern District of California

16

United States District Court

For the Northern District of California

unlawful conduct on employee morale, organizational activities, and membership in the union.  *Id.* (citing *Master Slack Corp.*, 271 N.L.R.B. 78, 84 (1984); *Olson Bodies*, 206 N.L.R.B. 779 (1973)). An employer may not avoid the duty to bargain by a loss of majority status caused by its own unfair labor practices unless it can show that "the unfair labor practices did not significantly contribute to such a loss of a majority or to the factors upon which a doubt of such a majority is based." *N.L.R.B. v. Williams Enterprises, Inc.*, 50 F.3d 1280, 1288 (4th Cir. 1995).

In this case, Petitioner has offered, and the ALJ found, multiple instances of unfair labor practices occurring prior to Respondent's withdrawal of recognition.  (Pet. Ex. B. at p. 10.)  In applying the four evidentiary factors, the ALJ noted that Respondent had unlawfully terminated housekeepers Valencia and Maldonado immediately prior to its withdrawal of recognition, and that Respondent had made unlawful threats and promises to multiple employees in an attempt to obtain support for an anti-union petition.  (*Id.*)  Accordingly, the ALJ found that Respondent could "not rely on an expression of disaffection by its employees which is attributable to its own unfair labor practices directed at undermining support for the union" and that Respondent's withdrawal of recognition therefore violated sections 8(a)(5) and (1) of the Act.

Respondent makes two arguments against Petitioner's evidence and the ALJ's findings regarding the anti-union petition.  First, Respondent argues that its conduct was consistent with Board law prohibiting an employer from bargaining with a union that has lost majority support, citing *Dura Art Stone, Inc.*, 346 N.L.R.B. No. 14 (2005).  The Court finds Respondent's authority inapposite.  In *Dura Art Stone*, the Board upheld an ALJ's finding that a union and an employer violated the Act by continuing their negotiations and executing a collective-bargaining agreement when they had knowledge of employee disaffection petition establishing the Union's loss of majority status.  *Id.*  There, the union and employer received untainted objective evidence that the majority of employees no longer desired the union's representation at a time just prior to the existing contract's expiration, when no election petition could be filed.  *Id.*  Knowing that no petition could be filed, the employer and union unlawfully thwarted the majority will and entered into a new three-year contract.  *Id.*  Here, unlike *Dura Art Stone*, Petitioner produced evidence tending to prove that the employee's union disaffection was a product of Respondent's own unfair labor practices.  Because

1   Respondent's unfair labor practices may have affected the Union's support, *Dura Art Stone* is

2   inapposite on this record.

3       Second, Respondent argues that the ALJ did not make the necessary findings of fact to

4   disregard the actual signatures on the anti-union petition.  More specifically, Respondent argues for

5   an evidentiary standard requiring "specific proof" of a causal relationship between the unfair labor

6   practice and the ensuring loss of union support, citing *Lee Lumber & Building Material Corp*. 322

7   N.L.R.B. 175 (1996), *Quazite Corp*., 323 N.L.R.B. 511 (1997), and *Quazite Div. of Morrison*

8   *Molded Fiberglass Co. v. N.L.R.B.*, 87 F.3d 493 (D.C. Cir. 1996).  The Court finds that neither

9   decision changes the standard for determining causation.  Therefore, as more fully explained below,

10  the decisions relied upon by Respondent are factually distinguishable on the record before the Court.

11      In *Lee Lumber & Building Material Corp*., the Board expanded on the term,  "specific

12  proof," in a footnote, and cited to the four evidentiary factors set forth in *Williams Enterprises*, 312

13  NLRB at  939, and *Master Slack Corp*., 271 NLRB at 84.  *Lee Lumber*, 322 N.L.R.B. at 177 n. 16.

14  (Pet. Ex. B at p. 10.)  Accordingly, there is no basis for Respondent's argument that there is a

15  heightened "specific proof" standard that is independent of the four evidentiary factors.  Here, as

16  required, the record indicates that the ALJ considered and applied the four evidentiary factors.

17  There is no evidence that the ALJ applied an incorrect standard in reviewing the allegedly tainted

18  anti-union petition.  Furthermore, Respondent has failed to cite authority that the term, "specific

19  proof," creates a more strict evidentiary standard than the application of the four factors articulated

20  in *Master Slack Corp* at its progeny.

21      *Quazite* is similarly inapposite.  In *Quazite*, the record was unclear as to whether the NLRB

22  ever considered the employer's defensive explanation for the union's loss of support.  *Quazite*, 87

23  F.3d at 497.  There, in reviewing the NLRB's finding of unlawful withdraw of recognition, the

24  Appellate Court specifically noted the NLRB's failure to apply the four evidentiary factors.  *Id*.  The

25  Appellate Court stated,

26          We have no indication in this case, however, that the Board applied
            these factors or for that matter any factors. Indeed, apart from the
27          conclusory statement that the employer's unfair labor practices "were
            the type of violations that tend to undermine the Union's status in the
28          employees' eyes ... and did so," the Board provided no explanation for
            its key finding that "the withdrawal of recognition occurred in an

**United States District Court**
For the Northern District of California

1

> atmosphere and context poisoned by Respondent's commission of
> unfair labor practices which had the effect of contributing significantly
> to the Union's loss of majority among the bargaining unit employees."

2

3   *Id.* (citing *Quazite Corp.*, 315 N.L.R.B. at 1080).  On remand from the Appellate Court, the NLRB

4   applied the factors and concluded there was an insufficient nexus between the respondent's unfair

5   labor practices and the allegedly tainted anti-union petition.  *Quazite Corp.*, 323 N.L.R.B. 511, 511

6   (1997).  In support of its conclusion, the NLRB made a series of findings.  *Id.* at 512.  First, the

7   NLRB noted the remoteness in time between the respondent's unfair labor practices and the

8   employees' union disaffection.  *Id.* (stating that the parties continued to bargain for 2 more months

9   after the respondent's unfair labor practices).  Second, the NLRB relied on the ALJ's finding that the

10  respondent did not engage in bad-faith bargaining during the bargaining process.  *Id.*  Third, the

11  NLRB acknowledged that the respondent's remaining unfair labor practices were isolated to

12  employees who worked at a different facility.  *Id.*

13       In contrast to *Quazite Corp.*, here the record indicates that the ALJ considered Respondent's

14  defensive explanations for the Union's loss of support.  In rejecting Respondent's defensive

15  explanations, the ALJ specifically noted the nexus between unfair labor practices and resulting union

16  disaffection.  (Pet. Ex. B at p. 10.)  Also unlike *Quazite Corp.*, here there was no finding by the ALJ

17  that Respondent's unfair labor practices were isolated to certain employees who worked at a

18  different facility.  To the contrary, the ALJ found that most of Respondent's unfair labor practices

19  occurred at the hotel and that each unfair labor practice involved employees who worked there.  (*Id.*)

20  Accordingly, the current case is factually distinguishable to *Quazite Corp.*

21       In the Court's view, the record amply supports a finding of a causal relationship between

22  Respondent's unfair labor practices and the subsequent expression of employee disaffection with the

23  Union.  *Williams Enterprises*, 312 N.L.R.B. at 939.  In considering the relevant factors, first, the

24  Court finds that the union disaffection occurred shortly after a series of Respondent's unlawful

25  threats, promises, and terminations.  *Id.*  The Court finds the length of time between Respondent's

26  unfair labor practices and the union disaffection compelling.  Second, in considering the nature of

27  Respondent's acts, the Court concludes that promising benefits, threatening to cut hours, and

28  engaging in terminations of pro-union employees, are acts that would have a detrimental and lasting

effect on other employees.  *Id*.  Third, given the small population of employees at the hotel, Respondent's actions would have a strong tendency to cause employee disaffection with a union. Fourth, the Court finds that under the totality of the circumstances there is evidence that Respondent's unlawful conduct had the effect of stifling union support.  Accordingly, there is sufficient evidence to conclude the anti-union petition was tainted by antecedent unlawful conduct. Considering the evidence, and the ALJ's findings, the Court finds that Petitioner has demonstrated that he is likely to prevail on the merits of the section 8(a)(5) allegation.

In conclusion, the Court finds that Petitioner has demonstrated a strong likelihood of success of prevailing on the merits of the section 8(a)(1), (3), and (5) allegations.  Not only has Petitioner offered evidence, but the ALJ has made his own findings supporting Petitioner's allegations.  Since assessing the likelihood of success calls for a predictive judgment about what the Board is likely to do with the case, the Court finds the ALJ's determinations to be a useful benchmark against which the Regional Director's prospects of success may be weighed.

## II.     Irreparable Harm

In addition to likelihood of success on the merits, Petitioner must show that a temporary injunction is necessary to avoid irreparable harm.  Petitioner contends that irreparable harm is presumed because it has demonstrated a likelihood of success on the merits.  Aside from the presumption, Petitioner states that it will suffer irreparable harm in the absence of a temporary injunction because Respondent's conduct will undermine the employees' free exercise of rights guaranteed by section 7 of the Act.  Respondent argues that Petitioner's delay in seeking a section 10(j) temporary injunction is evidence that no irreparable harm will occur.  The Court finds petitioner's arguments to be well taken.

As discussed above, Petitioner has demonstrated a reasonable likelihood of success on the merits on each of the alleged violations.  Therefore, the Court will presume irreparable injury. *Miller*, 19 F.3d at 461 ("[i]f the Board demonstrates that it is likely to prevail on the merits, we presume irreparable injury."); *see also Nutri-Cology*, 982 F.2d at 398.  In statutory enforcement cases where the government has met the "probability of success" prong of the preliminary injunction test, courts presume it has met the "possibility of irreparable injury" prong because the passage of

United States District Court

For the Northern District of California

20

1  the statute is itself an implied finding by Congress that violations will harm the public. *Miller*, 19

2  F.3d at 459 (citations omitted).

3      Although further inquiry into irreparable injury is not required, the Court notes that even

4  without the presumption described above, Petitioner has sufficiently established irreparable harm.

5  The charge supporting evidence and the ALJ's findings demonstrate that Respondent has engaged in

6  a series of coercive acts that would severely harm future union efforts.  The Court finds that

7  Respondent's conduct would impair the employees' rights under the Act by causing an erosion of

8  support from the Union, by impairing the effectiveness of the Union, by making it difficult to

9  enforce union rules and regulations, and by making it difficult to preserve the collective bargaining

10  process. *Bloedorn*, 276 F.3d at 298-99; *Moore-Duncan v. Horizon House Developmental Services*,

11  155 F. Supp. 2d 390, 396-97 (E.D. Pa. 2001).  These are the precise harms that section10(j)

12  injunctions were meant to protect against by ensuring the alleged unlawful conduct will not succeed

13  in destroying a union before the NLRB can make a decision. Accordingly, the Court finds that

14  Petitioner has sufficiently established irreparable harm.

15  **III.    Balance of Hardships**

16      Petitioner argues that the balance of the hardships tips in its favor because without injunctive

17  relief, the Union and the employees will continue to suffer deprivation of their rights under the Act

18  while the unfair labor proceeding runs its course.  Petitioner maintains that Respondent will suffer

19  no harm through the imposition of an interim bargaining order that merely restores the status quo

20  ante.  Respondent disagrees and insists that Petitioner's delay in seeking relief undermines

21  Petitioner's hardship claim.  Respondent also argues that one of the discharged housekeepers,

22  Maldonado, has left the United States and therefore does not stand to benefit from the proposed

23  interim relief.  Lastly, Respondent explains that an injunction would force Respondent to cancel the

24  employees' existing healthcare, to incur additional attorneys' fees associated with the bargaining

25  process, and to fire its current innocent employees if Maldonado and Valencia are reinstated.

26      When considering the balance of hardships, the court must take into account the probability

27  that declining to issue the injunction will permit the allegedly unfair labor practice to reach fruition

28  and thereby render meaningless the Board's remedial authority. *Miller*, 19 F.3d at 460. Where the

**United States District Court**
For the Northern District of California

1   Petitioner and the Respondent each make a showing of hardship, the court must exercise its sound

2   discretion to determine whether the balance tips in Petitioner's favor. *Id.*

3         The Court, in the exercise of its discretion, concludes that the balance of hardships tips in

4   favor of the Petitioner. An interim bargaining order would merely restore the status quo and require

5   Respondent to bargain with the Union in good faith to an agreement or a bona fide impasse. At such

6   a point, Respondent could withdraw union recognition, provided that the employees' collective

7   decision to do so is untainted by unlawful labor practices. An order requiring Respondent to cease

8   threatening employees with loss of benefits or promising employees certain benefits, in order to

9   discourage union membership would have little hardship on Respondent. Requiring Respondent to

10   offer to reinstate Valencia and Maldonado has minimal hardship on Respondent compared to the

11   proposition of unemployment for the two housekeepers. Respondent's comparative hardships are far

12   outweighed by the hardship faced by the employees as the result of continued violations of their

13   fundamental rights under the Act. In light of their fundamental rights, and because failure to issue

14   an injunction would allow the unfair labor practice to continue, Petitioner demonstrated that the

15   balance of hardships tips in its favor.

16   **IV.    The Public Interest**

17         Petitioner contends that the issuance of an injunction will serve the public interest and further

18   the purposes of the Act by ensuring that an unfair labor practice will not succeed because the Board

19   takes too long to investigate and adjudicate" the case. *Miller*, 19 F.3d at 460. Respondent does not

20   substantively address a countervailing public interest that would be harmed by granting the

21   temporary injunction.

22         As discussed above, Petitioner has demonstrated a likelihood of success on the merits. In

23   statutory enforcement cases where the government has met the "probability of success" prong of the

24   preliminary injunction test, courts presume it has met the "possibility of irreparable injury" prong

25   because the passage of the statute is itself an implied finding by Congress that violations will harm

26   the public. *Id.* at 459. Accordingly, the Court finds that the public interest is advanced by the

27   granting of a temporary injunction.

28                                **CONCLUSION**

United States District Court

For the Northern District of California

1   For the foregoing reasons, the Court finds that temporary relief is just and proper to protect

2   the integrity of the Act while the NLRB resolves an unfair labor practice charge. 29 U.S.C. § 160(j).

3   The Court **GRANTS** the Petition for a Temporary Injunction and **GRANTS** the Motion to Try the

4   Injunction on the Basis of the Administrative Record.

5   **IT IS FURTHER ORDERED** that pending the final disposition of the matters now pending

6   before the National Labor Relations Board, Respondent, its officers, agents, successors, assigns and

7   all persons acting in concert or participation with it cease and desist from:

8   (1)      Threatening employees with loss of benefits or promising benefits, in order to

9   discourage union membership or activities;

10   (2)      Discharging employees or laying off employees, in order to discourage union

11   activities and union membership;

12   (3)      Withdrawing recognition from the Union as the exclusive collective-bargaining

13   representative of the Respondent's employees in the appropriate bargaining unit;

14   (4)      Refusing to meet and bargain with the Union as the exclusive collective-bargaining

15   representative of Respondent's employees in the appropriate bargaining unit with respect to rates of

16   pay, hours of employment, and other terms and conditions of employment including contributions to

17   health insurance, union security, and wages;

18   (5)      In any like or related manner interfering with, restraining or coercing employees in

19              the

20   exercise of their rights guaranteed by Section 7 of the Act.

21   **IT IS FURTHER ORDERED** that pending the final disposition of the matters now pending

22   before the National Labor Relations Board, Respondent, its officers, agents, successors, assigns and

23   all persons acting in concert or participation with it, shall take the following affirmative steps:

24   (1)      Within five (5) days of the issuance of this Order, offer in writing, immediate interim

25   reinstatement to Christina Valencia and Maria Maldonado to their former position at their previous,

26   wages, hours and other terms and conditions of employment, displacing, if necessary, any workers

27   hired or reassigned to replace them;

28   (2)      Upon request, meet at reasonable times and bargain in good faith with the Union as

**United States District Court**
For the Northern District of California

the exclusive collective-bargaining representative of its employees in the appropriate bargaining unit, with respect to rates of pay, hours of employment, and other terms and conditions of employment until either a good-faith lawful impasse or an understanding on a new collective-bargaining agreement is reached and, if such an understanding is reached, embody such understanding in a signed agreement.  The obligation to meet and bargain shall be for a reasonable period of time, not to exceed 90 days from the issuance of this Order and it shall, in no event, constitute less than three (3) negotiating sessions that are attended by all necessary parties.  Nothing in this Order shall interfere with the parties' statutory right to engage in a lawful strike and/or a lawful lockout, nor require Respondent to rescind any changes in terms and conditions of employment that were implemented after September 14, 2005, without bargaining in good faith with the Union.  The appropriate bargaining unit is: all employees covered by the collective-bargaining agreement between Respondent and the Union, effective by its terms until November 20, 2004, as extended;

(3)     Post copies of this Order at Respondent's South San Francisco, California facilities in all locations where notices to employees are customarily posted; maintain these postings during the Board's administrative proceeding free from all obstruction and defacement; grant all employees free and unrestricted access to the posting; and grant to agents of the Board reasonable access to Respondent's South San Francisco, California facilities to monitor compliance with the posting requirement; and

(4)     Within twenty (20) days of the issuance of this Order, file with the Court, with a copy served on the Regional Director for Region 20 of the Board, a sworn affidavit from a responsible official of Respondent, setting forth with specificity the manner in which Respondent is complying with the terms of the Order, including the locations of the posted documents and proofs of mailing.

///

///

///

///

///

**IT IS FURTHER ORDERED** that within 100 days of the entry of this Order, the parties shall file a joint statement informing the Court of the status of this case.

**IT IS SO ORDERED**

Dated: March 1, 2007

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California

25